Pages 1 - 34

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

SCILEX PHARMACEUTICALS, INC., )
)
Plaintiff, )
)
VS. ) NO. 21-cv-01280-JST
)
SANOFI-AVENITS U.S. LLC, et al., )
) Oakland, California
Defendants. )
) Thursday, July 22, 2021
)

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**: (By Zoom Webinar)

For Plaintiff:
LATHAM & WATKINS LLP
233 South Wacker Drive
Suite 5800
Chicago, Illinois 60606-6401
**BY: MATTHEW W. WALCH, ESQ.**

For Defendants Sanofi-Aventis and Chattem:
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
**BY: RANDI W. SINGER, ESQ.**
**MELISSA D. RUTMAN, ESQ.**

For Defendant Hisamitsu America, Inc.:
HUNTON ANDREWS KURTH LLP
200 Park Avenue
New York, New York 10166
**BY: JEREMY BOCZKO, ESQ.**
**ARMIN GHIAM, ESQ.**
**JAMES E. ROSINI, ESQ.**

Reported By: **BELLE BALL, CSR 8785, CRR, RDR**
Official Reporter, U.S. District Court

**Thursday - July 22, 2021** **2:00 p.m.**

**P R O C E E D I N G S**

**THE COURTROOM DEPUTY:** Your Honor, now calling Civil Matter 21-1280, Scilex Pharmaceuticals, Inc. versus Sanofi-Aventis U.S. LLC, et al.

If counsel could please state their appearances for the record, starting with counsel for the plaintiff.

**MR. WALCH:** Matthew Walch, counsel for Scilex Pharmaceuticals.

**MS. SINGER:** Randi Singer from Weil, Gotshal & Manges, counsel for defendant Sanofi-Aventis and Chattem. And with me is my colleague Melissa Rutman.

**THE COURT:** Good afternoon.

**MR. BOCZKO:** Good afternoon, Your Honor. Jeremy Boczko for Hisamitsu, and I'm joined by Armin Ghiam and James Rosini.

**THE COURT:** Welcome.

The matter is on calendar for a couple of motions to dismiss. I wish I had all day to hear argument, but I don't. So we're going to divide it up. Each side gets 25 minutes. I know that's not totally fair to the defendants, but the plaintiff has to respond to all of your arguments.

It's sort of -- I don't -- there's probably some better way than just giving each of the defendants 12-1/2 minutes. Maybe you figure that out in advance; I don't know.

Ms. Singer, do I need to -- um, should I be allocating that time? Or can I rely on you and your co-defendant's counsel to divide that up?

**MS. SINGER:** You can rely on us, Your Honor.

**THE COURT:** Good enough. Okay. Very good.

Well, it's a motion to dismiss, which means the defendants go first. So Ms. Singer, either you or Mr. Boczko can go first.

**MS. SINGER:** Your Honor, I'm going to start. I will take the standing under Article III and under the Lanham Act. We will transition in the middle of the FDA claims, the (a)(1)(A) claim, and then Mr. Boczko will finish the FDA claims and take the state-law claims, is our plan.

**THE COURT:** Okay.

**MS. SINGER:** So to the extent you have questions --

**THE COURT:** Not going to be a lot of questions today, I should think.

Mr. Boczko, I should tell you that having now read Judge Hixson's order in *Lona's*, I think I was wrong. And in the *L.A. Taxi-Uber* case. And it just doesn't make a lot of common sense to me, actually, to require reliance in a competitor-versus-competitor situation. It actually makes no sense.

So, I haven't done it yet. Obviously, I've taken a position publicly that goes the other way. But you might have

a little bit of a hill to climb, there. Just wanted to let you know. Otherwise -- sort of a lukewarm bench today, otherwise.

**MR. BOCZKO:** Your Honor, I'm prepared to respond.

**THE COURT:** Okay.

Ms. Singer, go ahead.

**MS. SINGER:** Thank you, Your Honor. Essentially what we have here is that the plaintiff has made a number of conclusory allegations. But even if the Court accepts all of those as true -- and we understand it's a motion to dismiss. But even accepting all of those as true, they have really simply failed to show that any alleged injury that they may have is traceable under the second prong of the Article III standing test, or is proximately caused under the second prong of the Lanham Act standing test by any of the defendants here.

What you have is you have OTC products that went on to the market in 2016, and began making all of the claims that were challenged here. They are available over-the-counter without a prescription in drugstores, grocery stores, mass retailers, online.

You then have plaintiff coming in, their patch is approved, and launched in 2018 for the treatment of pain associated with post-hepatic neuralgia for a very small number of potential consumers, available by prescription only. They cannot legally advertise their prescription patch for any use other than post-hepatic neuralgia.

And the products simply don't compete. If a consumer is in a pharmacy looking for a lidocaine patch for pain relief, they're going to see all of the defendants' patches, as well as a variety of other products. They're not going to see plaintiffs's patch.

You cannot walk into a drugstore looking for the Aspercreme patch or the IcyHot patch or the Salonpas patch and walk out --

**THE COURT:** Let me ask you about that, because there are many ways of a product coming to someone's attention besides just reviewing the products available on the shelf of the local pharmacy. And I know this is true, just from recollection of the papers with regard to Mr. Boczko's products.

But don't these products essentially say to the consumer: You don't need a prescription; this is just as good or almost as good, so you should just really buy this product. And if they do say that, isn't that a fairly explicit acknowledgment that the products really are competing in the same space?

Otherwise, why would a maker of such a product feel the need to even say that?

**MS. SINGER:** Well, Your Honor, the Chattem and the Sanofi patches don't say that. But even if they did, the point is you can walk into a drugstore and buy these patches, as against sprays and creams and oral pain relievers and

various other products, which is what they're competing with. They're saying those are -- and this is the maximum strength allowable for all of those claims. Um --

**THE COURT:** Wouldn't I have to find that in order to be competitor products, they have to be available in precisely the same retail channel?

Isn't that where you're headed?

**MS. SINGER:** You have to be targeting -- it doesn't have to be precisely, but you need to be targeting the same consumer. Our products -- the defendants' patches are targeting consumers who want to walk into a mass retail and purchase a lidocaine patch or some sort of over-the-counter pain relief. They're not targeting people who want to go to their doctors. You know, and by the way, they're going to their doctors for whatever they're going for.

Because the plaintiffs cannot actually legally advertise their patches for pain relief other than post-hepatic neuralgia, there's no way the consumers would even find out. They would need to go to their doctor and ask for some sort of pain relief. And you would have to have a doctor that says: Oh, I'm going to prescribe this branded patch for --

**THE COURT:** But, but doctors can do that lawfully, and they're doing that, aren't they?

**MS. SINGER:** Absolutely. But that doesn't --

**THE COURT:** You're saying doctors -- not only is it

not far-fetched what you said, it's occurring every day, I think.

**MS. SINGER:** Well, it's not targeting the same consumers. You're not targeting the consumers who are going to their doctor. You're targeting the people who are walking into these mass retail chains. They're simply different consumers.

And I think there's a lot of case law that says, you know, there needs to be -- and there's so many other -- there are competitors for the over-the-counter patches. The defendants compete with each other. There's lots of other products that are available on the drugstore shelves.

And the point is that if somebody is misled by one of the claims -- and we don't think they are, but we're on motion to dismiss, so let's assume. But even if somebody is misled, there is absolutely no evidence that that is a lost sale for plaintiffs. That is, there are so many other alternatives that these people would be going to before they go to the doctor and ask for a prescription, and then have to go fill it.

And by the way, the branded patch in the complaint, itself, acknowledges it's a Tier 2 or Tier 3, if it's even covered. So you've got a huge price differential, if it's covered at all. And it mostly isn't, because there are so many generic alternatives. There's just no --

**THE COURT:** Your brief is very well written, by the

way.

**MS. SINGER:** Thank you.

**THE COURT:** I don't know if you wrote it or someone who works for you wrote it. If it's someone who works for you, you should tell them I said that.

But, did you take Economics 101 in college?

**MS. SINGER:** I did, but college was a long time ago, Your Honor.

**THE COURT:** Yes. That's also true for me. But I remember enough of it to remember what substitutes and complements are.

Do you have that in mind?

**MS. SINGER:** I do.

**THE COURT:** Aren't you inviting me to rule that these products are not substitutes, as economists use that term, as a matter of law?

**MS. SINGER:** No. I'm saying that they have failed to allege in the complaint that there is any kind of causation here between these allegedly false claims and any lost sales that they may or may not have.

And, you know, I think the concept of lost sales when you're a second-comer to the market, it's more of a failure to gain the market share you were looking for. But we'll put that aside. That's a damages issue, not a motion-to-dismiss issue.

**THE COURT:** Very good.

**MS. SINGER:** I think even -- if you get past the standing issue -- and for a number of reasons, we don't think you should, because we don't think that they've satisfied either the Article III test or the Lanham Act statutory standing test, the zone of interest or the proximate cause.

But even if you get past that -- and I'm cognizant of time here, and I do want to leave my colleague Mr. Boczko some time -- I think the other issue here is that what they are most -- a lot of the claims that are being alleged are actually claims for which there's no recovery under the Lanham Act.

And that is claims either that these are FDA-approved products -- because I think the complaint is quite clear that that is not an explicit claim that's making. The complaint alleges that this -- these are implied claims, or the consumers are misled.

But I think the case law is very clear that you need to explicitly say that something is FDA-approved, or that it's a new drug application product. And that in the absence of that, there is no Lanham Act claim on an FDA approval, which is one of the claims that they're making under 1125(a)(1)(A) here.

And as well, I think some of the other claims that they're making are claims that either -- the claims that are being made by the defendants are inconsistent with the temporary -- with the monograph, or that they're not allowed under the monograph. And those are claims for which there was no private right of

action under the Federal Food Drug and Cosmetic Act. That would be an area where it is only for FDA to determine whether or not those claims can be made.

So to the extent -- and we're setting aside here claims that they say are -- are false or misleading, which, again, we don't agree with, but it's a motion to dismiss. But the claims that are being alleged that are impermissible under the monograph or illegal for us to make, those claims, there's no private right of action here under the Lanham Act.

And with that, unless you have questions on any of those points, I'm -- I'm -- I'm going to take it from the compliment that you have read our briefs, so I don't --

**THE COURT:** Yes. I try to read the briefs before the hearing. That's true. I do that. I would say -- I don't have any questions for you.

I would say to your opponent that I think some of your points about making claims about FDA, some of the defendants' arguments there are well-taken. Without passing judgment on your other arguments. So, yeah. I have no other questions.

**MS. SINGER:** I think that is an excellent point for me to stop talking.

**THE COURT:** All right. Mr. Boczko, it sounds like you have the microphone.

**MR. BOCZKO:** Thank you, Your Honor. And I'll directly go straight to the state-law claim so that we have

sufficient time to address any of Your Honor's concerns about those claims.

As Your Honor notes, and as the parties have briefed, the California false advertising and unfair competition laws are not mirror images of their federal cousins.

As Scilex' own brief notes, the overwhelming majority of courts in California have required that there's actual reliance by the party itself -- is undisputed, that Scilex does not rely on what it purports to be false. Instead, Scilex points to a minority of decisions where courts have stated that the Proposition 64 was passed to limit these state-law claims. And those decisions point directly to the motivation, which was to prevent attorney-conjured claims.

But that's precisely what Scilex' complaints consist of. There is a real noticeable gap between Paragraph 61 and 62 of the complaint. Paragraph 61, Scilex offers interpretation of what it claims is not literally false, but would be interpreted by the public. And then 62, it just says the public -- or a (Inaudible) number of consumers would be confused. It doesn't tell the who, what, where and why. It's attorney argument, almost. And that is precisely the issue, and one majority require plaintiff to personally rely on it.

Now the minority competitor cases relied on by Scilex are also far and away different, factually. Those are indisputable direct competitors. It was a furniture store versus a

furniture store. A supplement company using another supplement company's trademark to sell the product. It was Door Dash saying a store was closed when it was not. Scilex is not a direct competitor.

Now, they will argue --

**THE COURT:** I have to tell you, as you probably discerned from any comments to Ms. Singer, I have a lot of trouble with that argument.

**MR. BOCZKO:** I understand, Your Honor. But the -- the -- when a consumer confronts a product of either defendants in a pharmacy, they are not likely to see any other product that's marketed for lidocaine for the temporary relief of pain.

A real and remarkable difference --

**THE COURT:** But if they're not competitors, it would make literally no economic sense for your phenomenally successful client to claim, as it does -- we've established that Ms. Singer's client doesn't do this -- that: Hey, we're almost as good as a prescription.

If the same consumer would not be even considering that, why would it even be on the label? It just doesn't make any sense.

**MR. BOCZKO:** Well, Your Honor, Scilex's product is not marketed for this purpose, not FDA-approved for this purpose. However, Hisamitsu and other defendants' products

are approved for the temporary relief of pain. That is undisputed at this point. And that's why they are not direct competitors.

But I, do concede that Scilex argues a zone of interest within --

**THE COURT:** No. My question is: Why does your client, in its marketing, say: You should buy our product and not a prescription product, in so many words, if the two products don't exist in the same competitive market?

I just don't understand.

**MR. BOCZKO:** Well, there is a difference between a prescription higher-grade product and a lower-grade product, an OTC product. An OTC product can be taken, according to the monograph, for three to four times a day. Prescription product doesn't necessarily work in all respects in the same way that an OTC product will work in an OTC formulation.

So, yes, there are OTC formulations and prescription formulations of higher degrees. But they do not -- they're not one-for-one equivalents. It doesn't require an insurance company. It doesn't require a doctor's permission to decide to provide a prescription lidocaine patch versus anyone else.

I can go to the pharmacy, and I can take Tylenol, maximum strength Tylenol. I can go to a hospital and actually get a higher formulation of Tylenol, as well.

Your Honor, I apologize. Your, your screen looks a little

bit frozen, so I just want to make sure you are still there.

**THE COURT:** No, I'm fine. You're coming through very clearly. Thank you.

**MR. BOCZKO:** Thank you.

Second, Scilex does not allege a cognizable ownership in defendants' sales. So to allege a loss of property or money does have a prior possession or vested legal interest. These are OTC sales. Scilex is not to entitled to sell its products OTC. It's not a formulation that fits the OTC requirement.

But noted in *Korea Supply* (Phonetic), the Supreme Court of California ruled that even a contingent expectancy of payment from a third-party is still not enough. But for defendants' act, those sales could not have gone to Scilex as opposed to anyone else.

So here, you know, Your Honor, it is within perhaps a zone of interest that they would want to allege, but they aren't entitled to OTC sales. Those are something not theirs to have.

And if Your Honor would like, I can go on to false designation, which I think are some considerable and important points to make as well.

**THE COURT:** Sure.

**MR. BOCZKO:** So, to establish (Inaudible) --

(Reporter interruption)

**MR. BOCZKO:** My apologies, Madam Court Reporter. I hope it's better now. I'm moving my air pods closer.

So under 1125(a)(1)(A), there must be a false designation. And in claim 1, Paragraphs 65 to 74, Scilex alleges that its false designation is FDA approved. However, the defendants' patches and advertising make no representations concerning FDA approval. It does not appear in these advertising, and the amended complaint does not plead facts at all as to how or why consumers would assume these products that are FDA-approved make the leap to a doctor wearing a white-label coat necessarily implies FDA approval. It is no different than a doctor with a white-label -- a white lab coat, I'm sorry -- who prescribes ZTlido for non-approved use.

The courts in *Mylan* and *Eli Lilly* and *HealthPoint* and *Sharon Crowl* (Phonetic) clearly state that simply including a product in the stream of commerce, even with a designation of Rx only, does not imply FDA approval.

Moreover, this precedent is also clear that a designation of FDA approval is rightly afforded exclusively to the FDA under the FTCA. And a private party may not use the Lanham Act to create a private right to enforce that. There is a significant difference between *POM Wonderful* and *Hain Celestial*. Those cases do not involve false designations of the word "FDA approval." Instead, it's whether a pomegranate juice can both -- I'm sorry, whether a party alleging to have a pomegranate juice can be sued both by a competitor and the FDA, if it doesn't contain enough pomegranate juice.

But in contrast, we are talking whether a private party can assert a right under the Lanham Act to whether something is designated as FDA-approved.

Now, in response, Scilex cites to a 2014 California decision in *JHP Pharmaceuticals* as a case that addresses where a defendant explicitly advertised their product as approved for -- FDA-approved for generic usage, with pages and pages of allegations supporting these claims. And how it harms direct competitors to the plaintiff, who is a brand manufacturer of the same exact drug.

The amended complaint does not offer the same. There are no allegations that we marketed our product with any FDA designation. There are no allegations of direct competition, one for one, that we are a 8 percent or a 5 percent equivalent. So as a matter of law, these claims must be dismissed.

Now, I see we are running out of time, Your Honor, so if possible, I would like to reserve any remaining time for reply.

**THE COURT:** Very good. I'll let -- I'll let Ms. Lee tell me in a second how much time you have. But you do have a few minutes. Okay. Just making a note.

Mr. Walch.

**MR. WALCH:** Yes, Your Honor.

So Your Honor, you've hit on some key points I was already going to make, so you're ahead of me already. But I do want to highlight, obviously, that, you know, the allegations in the

complaint make clear that the products at issue here are all lidocaine patches. They are used to apply -- they're applied to the skin to address pain. These are the same products.

And in fact, I think Hisamitsu's advertising highlights that, in fact, in one of the allegations that we identified or highlighted in Paragraph 61 where they indicate Salonpas follows the same principles used for the prescription version of these patches, making it the same size, and using the same hydrogel technology as its prescription cousin. The only change they made was to improve the price so as to make the product more accessible to the general public.

As Your Honor has recognized, these are all lidocaine patches designed to treat pain. They are substitutable. They are competing. And they are working to get to -- or they -- all three of these companies are looking to sell their product or hoping to sell their product to consumers who want to use them to relieve their pain.

As this complaint -- as our complaint makes very clear, we are alleging specific allegations of false advertising on the part of the two defendants that's directed at specific misimpressions or false representations that they are making to consumers in order to promote their products, and that such false representations and deceptive misrepresentations have caused harm or damage to our product sales.

It is clearly specified in our complaint. And the

allegations are specifically highlighted. And I want to just highlight this because, you know, it is not recognized in the replies, in our complaints.

In each count, we have a specific allegation. So particularly, not only do we have the allegations regarding harm in the general allegations in Paragraphs 11, 12 and 60, but also in Paragraphs 80, 91, 101, and 108, we specifically articulate the harm that Scilex is suffering as a result of that deceptive conduct, and the harm that it will suffer if this deceptive conduct continues.

And that harm is made clear to cover not only lost sales, which is identified as a reduction in demand for our products and reduced revenues, but also a diminishment in good will for these lidocaine patch products when consumers experience the defendants' products and they don't stand up to the claims that they are making about them.

They are, in other words, creating an artificial depression on the market for our products, and lidocaine patch products, in general, by virtue of their conduct. And so that's the false advertising that we have alleged is violative of this -- of the Lanham Act and the California state statutes. And that's the false -- and that's clearly the injury that we've identified that suffices under both Article III and under the state and federal statutes.

To address the specific arguments that Ms. Singer made

about the notion that our allegations are conclusory, I would submit that they are far from that. We are very clear in a very extensive complaint where we identify the nature of our products, the nature of the defendants' products, the way in which they are experienced by consumers, and how those consumers encounter the advertising that the plaintiffs -- I mean the defendants have engaged in, and how that advertising impacts their perception of the product market.

Those allegations clearly suffice as identifying a concrete and particularized injury under Article III for an injury in fact. And they're also more than sufficient in identifying the traceability and the proximate-cause elements that Ms. Singer highlighted with respect to the damage.

We have made clear in our complaint how those false advertising statements and deceptive advertising statements impact consumers, and in turn, impact the market for our product. The ZTlido product. So we have made clear how we have alleged sufficient Article III standing and alleged standing under the statutes.

I do want to address specifically the FDA comment you made, Your Honor, with respect to that Count 1.

**THE COURT:** Yeah. Well, I think you have some trouble with implied approval.

**MR. WALCH:** So, yeah. Let me address that. There's two issues here.

Obviously I would acknowledge, as you have, that it's clearer with Hisamitsu's advertising than it is with Sanofi's advertising. As I just articulated, in the Hisamitsu advertising with Dr. Bob Arnot and the copy that related to the blog post, they are clearly aligning their product to the FDA-approved products, and suggesting they are essentially the same product. The equivalent of an FDA-approved product.

We submit that that, in and of itself --

**THE COURT:** Do they say -- do they say the word "FDA" anywhere?

**MR. WALCH:** They do not use the word "FDA," we acknowledge that.

**THE COURT:** Well, you've got a barn-door problem. The barn-door problem is if I say that's enough, then anybody that's in a competitor fight with -- you know, whose product happens to be FDA-approved could be making this claim. And I just don't think that's what the courts want.

**MR. WALCH:** Let me address that, Your Honor.

So first of all, the Lanham Act provides that any -- any party that uses -- 1125(a)(1) specifically provides that use of a mark that is likely to cause confusion, mistake or deception, as the affiliation, connection or association of such person with another, or as to the origin, sponsorship or approval of his or her goods or services by another person, is going to be subject to a claim under 1125(a).

And the case that we've cited, the *JHU* (Phonetic) case that we cited makes clear that there is room for a consumer-based deceptive advertising claim if consumers take the advertising that defense engaged in, and perceive that as implying approval by the FDA. That's different than making an explicit claim of FDA approval that is inconsistent or contradicted by the FDA regulations. So in other words, that's a different claim.

This whole notion that our claim requires -- you know, is preempted by or somehow subject to the primary jurisdiction of the FDA is a fiction. Because nowhere in our claims are we suggesting that what the defendants are doing is violating the FDA requirements for indicating approval.

We are, instead -- these claims are very specific and are focused on the deception that these -- these advertising claims cause amongst consumers regarding the approval of their products.

Now, obviously we're going to have to prove this. This is something at trial we would have to prove. But on a motion to dismiss, the allegations we made are more than sufficient to demonstrate or establish the plausibility that consumers perceive these claims as equating or indicating FDA approval.

Now, I agree we're going to have -- it's going to be more challenging to prove that with respect Sanofi's advertising than it is with respect to Hisamitsu's advertising. But

nonetheless, for purposes of a motion to dismiss, we have alleged sufficient facts demonstrating how these claims can cause that impression amongst consumers, and how that impression is going to depress the market or has already depressed the market with respect to our products.

So, again, we are not making -- and this -- I just want to briefly address Hisamitsu's arguments about the suggestion that we've added in too much -- you know, that there's impertinent or scandalous allegations under Rule 15 in this.

We have not added in these allegations regarding the FDA standards and the monograph for the purpose of making a claim based on them. We are adding them in for color or context regarding the nature in which these products have been introduced to the market, and the way in which they have been allowed to be on the market, and --

**THE COURT:** Motions -- motions to strike of this kind are very much disfavored. And I don't think you need to spend a lot of time on that.

**MR. WALCH:** Okay. And I appreciate that, Your Honor. And that, from our perspective, is why our claim -- it highlights why our claim is focused on the perception on consumers, and the deception and the misleading nature of these advertising claims to those consumers.

So that's why we meet the standards for traceable Article III standing. That's why we meet the standards for

proximity, proximate causation, under the Lanham Act. And it certainly suffices for meeting the standards under the equivalent state statutes for false advertising and unfair competition.

There -- Ms. Singer had made an argument about the notion that these products don't compete. I think Your Honor hit on the primary points I would make. As we've made clear, the Hisamitsu advertising undermines that whole argument. The two products are essentially the same -- or the three products at issue here, the two Chattem products and the Hisamitsu products are essentially the same; they're lidocaine patches designed to treat pain. And the claims that these are just as good or almost as good really demonstrates exactly why these products are substitutable.

As far as the argument relating to the retail channel, and the way in which those two channels are somehow different, again, we submit that that's not the way the law works. It doesn't create, you know, bright lines between the OTC market and the prescription market, and saying you -- and essentially, to grant their motion as articulated here would create this bright-line rule where an OTC company is immune from a false-advertising claim from a prescription-based company. And that is just not appropriate here.

In fact, OTC and prescription products routinely compete, either directly or indirectly, for the same consumers. And

these are -- this is just one example where that's the case. And our allegations in the complaint make clear how these products do compete.

In many ways, this argument previews the trial strategy of the defendants, which I understand and appreciate. But that's not appropriate on a motion to dismiss. They have highlighted, for example, other reasons why we might have lost sales. Or other reasons why consumers might have different reactions. Other companies that are out there. That's all not appropriate to be considered on a motion to dismiss. That's trial arguments.

Obviously, we are going to be held to our proofs; we're going to have to show the way in which these false advertising claims have caused damage on us. And we intend to do that at trial. But it is not appropriate to dismiss a case at this stage, based on those arguments.

I covered the 1125(a)(1)(A) claim. And last but not least -- and I won't spend much time on -- as I know, the last thing I want to do is waste time and try to address an issue that it sounds like you're already with us on.

But obviously, the *Allergan* case we believe, as well as the subsequent cases, have articulated exactly why that's the proper way to interpret the *Tobacco II* cases and the *Kwikset* case, which are the two Supreme Court cases that you relied upon in your initial decision in the *L.A. Taxi* case.

You know, *Allergan* walked through the exact arguments and rationale, and then the subsequent cases, including the one you identified, specifically adopted that same reasoning. We think that's obviously the right approach; it makes perfect sense. And as *Allergan* identified and acknowledged, you know, to hold otherwise would be defeating the whole purpose of the statute, which is designed to address false and deceptive and unfair-competition acts that impact not only consumers, but also competition.

And so, Your Honor's, I think, rightly recognized that these cases do have the right analysis in the way in which this should be handled from a state-law perspective.

There's one other point I just wanted to address -- I think I've got a little more time here -- that's addressed in the reply briefs that was new, that I would just want to make -- to make clear here.

There was an argument in Sanofi's brief that we somehow waived arguments. I want to be clear here that we obviously -- I'm sure you're not going to be surprised, we disagree with that. We don't think we've waived any arguments. In fact, we have not.

First of all, I'd highlight that the two cases that they rely on are totally indistinguishable and inapposite. They cite the *Citizens for Free Speech* case, in which it's an instance where the plaintiff did not respond to a

three-and-a-half-page argument regarding claim preclusion. That's clearly not the case here.

The other case, *Hakakha*, is a case where the plaintiff didn't respond to a motion to dismiss on seven different counts. Again, that's not the case here.

The arguments on specific waiver are about the way in which we respond to their arguments about -- about proximate cause and injury. We've obviously answered those arguments. We've highlighted the allegations in the complaint that support our claims of damage and support our claims for causation, and certainly support our overall claims for deceptive and misleading advertising.

The last point I want to address was a chronological point. They argued about how we've somehow, you know, ignored or not responded to the chronological point about the way in which the product -- the claim is being asserted --

**THE COURT:** Your -- you mean your coming onto market after their products --

**MR. WALCH:** Correct. And we addressed that in the laches issue, and felt like that addressed all the argument, and handled it, which is -- and frankly, their Article III argument makes our point. We can't assert a claim until we have an Article III injury.

**THE COURT:** Yes. Now, the laches presumption does not apply in your case, for the reason that you --

**MR. WALCH:** Yeah.

**THE COURT:** -- just described, which is: You cannot be -- you cannot have an injury until you're in the market.

**MR. WALCH:** (Nods head)

**THE COURT:** So I think you probably win the laches point, also.

**MR. WALCH:** Yeah. And similarly, they made that argument with respect to the injury point, and argued somehow that that undermines our claim as a matter of not being able to establish Article III injury or standing under the statute. And that has a similar problem.

Again, our standing, our ability to assert those claims arises once we have the injury, and it's concrete and particularized, and that's what we've alleged. It happened after we got in the market, and after we identified that we had a sizeable portion of consumers using our product off-label, which is, as you recognized, an appropriate way in which products can be prescribed.

And that's what gave rise to us evaluating the claim, and deciding to assert this claim, because of the strong feelings we have about the impact that the defendants' false and deceptive advertising is having on our market.

So I think that addresses the points that the plaintiffs -- the defendants had made in their arguments, and the new points that were presented.

I think there was one last new point that was addressed, which was some question about arguments about our irreparable-harm allegations. And just to be clear here, we believe we've sufficiently alleged that as well. To the extent that the words "irreparable harm" are not -- aren't stated and that's not sufficient, we can certainly amend that. But I think the context is clear, and you can certainly infer from what we've presented that there's irreparable harm.

I did want to highlight one case, given it's a new argument that was made in the brief that -- that demonstrates that -- that makes it clear that you can construe irreparable harm on an FAL and UCLA claim. That's *Meyer v. CVS Pharmacy* (Phonetic). 2021 Westlaw, 1559367, at Star 13 at Page 13. Makes it clear that the parties can assert a claim.

The other case that supports our position is *Rothman v. Equinox Holdings*. That's 2021 Westlaw, 1627490, at Stars -- Pages 11 through 12. Again, also making clear that the -- that you can infer future harm here.

And to be clear, here, that's all the injunction we are seeking is to address the future harm. The damages are with respect to past harm. The injunction we're asking for is only to preclude any future harm that we might suffer.

I think that's all that I want to present to you, Judge. If you have any other questions, I'm more than willing to answer them.

**THE COURT:** No, thank you. You did one of my favorite things, which is you left time on the table.

The defendants do have some time remaining. I have my own calculation, but I like -- Ms. Lee's usually a little more accurate than I am.

Ms. Lee, how much time do they have left?

**THE COURTROOM DEPUTY:** Seven minutes, 39 seconds, Your Honor.

**THE COURT:** There you go.

Ms. Singer?

**MS. SINGER:** I have two quick points, Your Honor.

I think the first is even if I'm unable to change your mind about whether or not the parties are competitors and whether or not these patches compete, I think it is worth noting that even if they are competitors, that does not satisfy the standard. It doesn't show causation.

You have the *Allbirds* case where they actually were direct competitors. They were both making wool runners or sneakers. And it's still not enough.

I think Mr. Walch cited several paragraphs, he talked about the lost sales. That's not enough for causation.

First of all, Paragraphs 80, 91, 101 and 108, which I believe is what he cited -- and my apologies if I wrote it down wrong -- but those are all, verbatim, the exact same paragraph. And they all very conclusorily allege that Scilex has been

damaged and will continue to be damaged in the form of diminished goodwill of the ZTlido mark.

And I would submit there that some -- some -- aside from the arguments that Mr. Walch just made on the diminished goodwill and how customers experience these, there's really nothing in the complaint on the diminished goodwill of the trademark.

There's no allegation, certainly, that any of the defendants used the ZTlido trademark, or made any comparison. And there's really no allegations that consumers would experience -- even if these claims were right, even if this were consumers' experience that these weren't true, there's nothing that shows that they would take that out on the Scilex -- the plaintiff's patches. And I would submit that's because they're not competitors. But I understand that ship may have sailed.

But I think the point here is that these injuries aren't -- you can say there's lost sales, but there's nothing in here that alleges actual lost sales. There's nothing showing any consumer -- that ZTlido Scilex's sales went down. There's nothing showing that their sales would have been higher. And I think the redressability claim piece of the Article III test goes to that, frankly.

Even if the Court were to enjoin these ads, which obviously, you know, I do not think that you should because we

think that they're all true. But putting that aside, it doesn't mean that these are sales that would go to -- it wouldn't take these products off the market. And it wouldn't actually change -- there's no proof of, nothing, no allegation that these sales would actually go to Scilex and to plaintiffs because that's where you get into: If these claims were enjoined, you're still saying that consumers would then go to the doctor, find out about these other things, and go through all of the other steps.

So, you know, I think even if we were to assume that they're direct competitors, that doesn't get us all the way there. A number of the cases that are cited in the briefs, people do allege competitors. And that's not enough, without showing the lost sales, without showing the causation, without showing somehow this chain of inferences.

And I think there's too many alternative explanations in the complaint, in the -- that we've pointed out, as to why these sales -- why Scilex may not have made the sales that it wanted to make or, you know, lost the sales that it claims it made, having nothing to do with any of the defendants' advertising.

And I -- I would also just submit that on the state-law point, even if you put aside reliance, I think that there still needs to be proof of causation.

And for all of the reasons that I just argued on the

Article III and the Lanham Act claim, I think they've failed to allege causation on the state-law claims as well.

But let me leave Mr. Boczko however many minutes I just left Mr. Boczko.

**THE COURT:** Mr. Boczko.

**MR. BOCZKO:** Thank you, Ms. Singer.

Just very quickly, Your Honor, again on those state-law claims, because Proposition 64, at least as the minority decisions point out, were intended to limit attorney-conjured complaints where perhaps they would file the complaint and then look for potential class members later, even following that line of cases, I think that same direction should be followed here.

Here, plaintiff's complaint doesn't actually identify any factual allegation of any customer or anyone -- an industry periodical, a tweet, anyone -- adopting any of the interpretations that they've adopted in Paragraph 61. It seems to be that they are arguing that perhaps a consumer could theoretically interpret these statements as they do, but they don't allege the how, why, what, that a consumer does interpret it the way they do, or at least an appreciable amount of consumers, which is required.

So to preserve that important limitation on the state-law claims, it's important, I think, for Your Honor's consideration also to note that there aren't factual allegations of anyone

actually adopting those interpretations, notwithstanding these products have made them for about approximately five years at this point.

Secondly, on the false-designation issue, yes, we cite to a number of cases in our brief where the courts are quite explicit that even comparisons or words like "generic" or "bioequivalent" are insufficient to allege that something is an exchange for an FDA-explicit mark. And that is the same case here.

There is no dispute amongst parties that our advertisements do not say "FDA," but rather, plaintiff alleges because we compare our products to a prescription product, that implies that we, too, are FDA approved. But the comparison, itself, implies that the two products are also different. They're not the same. Otherwise, there wouldn't be a need for a comparison.

So I would also point Your Honor to the cases we cite in our brief which say for a designation issue, it requires an explicit reference to FDA designation and approval.

That's it, Your Honor.

**THE COURT:** All right.

Mr. Walch, your opponents got a reply because it is their motion.

**MR. WALCH:** Understood.

**THE COURT:** So the motions will now stand submitted,

and I'll move on to the next motion on my calendar.

Thank you all very much for your arguments.

**MS. SINGER:** Thank Your Honor.

**MR. WALCH:** Thank Your Honor.

(Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR

Sunday, August 8, 2021